UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:06CV-42-R

BILLY BATEMAN                                                            PLAINTIFF

v.

TOM SIMPSON, et al.                                                    DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court upon the Defendants' Motion for Summary Judgment
(Docket #47).  The Plaintiff responded (Docket #56), and the Defendants replied (Docket #60).
This matter is ripe for adjudication.  For the following reasons, the Defendants' Motion is
**GRANTED**.

## BACKGROUND

This case arises out of an incident that took place in the early morning hours of April 1,
2005, in the Maximum Security Segregation Unit at the Kentucky State Penitentiary.

The Plaintiff's version of the following events differs, unsurprisingly, from the version
proffered by the Defendants.  Generally, in such a situation, "courts are required to view the
facts and draw reasonable inferences 'in the light most favorable to the party opposing the
[summary judgment] motion.'"  *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quoting *United
States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  In qualified immunity cases,
such as this one, "this usually means adopting...the plaintiff's version of the facts."  *Id.* at 1775.

Here, however, the Court has been provided with a videotape capturing the events in
question and which generally serves to negate the Plaintiff's claims.  The Defendants have also
provided the Court with the affidavits of several of the individual defendant officers involved in
the incident in question, multiple other affidavits, the Plaintiff's medical records from the

Kentucky Department of Corrections, and extensive documentation regarding the Plaintiff's history.  The Plaintiff has presented little beyond his meager version of the facts and a few medical records.

In arriving at the following facts, the Court has reviewed the video and the submitted documentation, and has considered the Plaintiff's version of the facts.

The events in question took place in the Maximum Security Segregation Unit at the Kentucky State Penitentiary (KSP), where the Plaintiff was housed for the express purposes of serving ordered segregation time.  The Plaintiff had been committed to the custody of the Kentucky Department of Corrections (KDC) to serve a sentence of eighteen months pursuant to a July 27, 2004, conviction in Boone Circuit Court on charges of Receiving Stolen Property with a value in excess of $300.00, a Class D Felony.

On February 28, 2005, the Plaintiff was housed at the Roederer Correctional Complex (RCC) in La Grange, Kentucky, when he incited a disturbance among inmates in the recreation room and took physical action against three officers attempting to restrain him.  The Plaintiff was found guilty of four major disciplinary violations and sentenced to 345 days segregation time.  As a result, a detention order was issued to detain the Plaintiff at the Correctional Treatment Unit (CPTU) at the Kentucky State Reformatory (KSR) for a psychiatric assessment. At the conclusion of the assessment period, medical staff from both the RCC and CPTU approved the Plaintiff's transfer to KSP, without restriction as to housing.

Dr. Wayne Herner, a licensed psychologist at the CPTU, conducted a psychological assessment of the Plaintiff on or about March 8, 2005, to determine whether the Plaintiff should be held responsible for his actions in connection with disciplinary proceedings from the February

2

28, 2005 incident.  Dr. Herner determined that Inmate Bateman did not suffer at that time from a mental illness or defect which substantially affected the Plaintiff's cognitive, emotional, or volitional processes, and that Plaintiff therefore was accountable for his behavior.  The Plaintiff was therefore transferred to KSP's Maximum Security Segregation Unit on March 21, 2005, where there was available bed space in the segregation unit for an inmate serving an extended segregation sentence.  The Maximum Security Segregation Unit is located on 13 Left Walk in Cellhouse 3 at KSP, where Defendants Belt, Hines, Thompson, Redmond, Slaton, and Tovery were corrections employees assigned to Cellhouse 3.

In the days leading up to the incident in question, the Plaintiff was involved in several incidents akin to what transpired on April 1.  On the night of March 24, 2005, Defendant Thompson observed the Plaintiff beating his fist against his cell door and causing a disturbance. The Plaintiff refused to comply with Defendant Thompson's direct order to stop beating his fist. The banging continued for another forty minutes, and the Plaintiff refused to obey a second direct order to stop banging his fist.  Defendant Thompson filed a disciplinary report charging the Plaintiff with a violation for failing to obey an order; the Plaintiff was found guilty and sentenced to thirty days loss of good time.

On March 29, 2005, at approximately 12:10 a.m., Defendant Hines came across the Plaintiff sitting his cell, bleeding from the head.  When Defendant Belt arrived at the scene, the Plaintiff told them that he had fallen and hit his head.  The Plaintiff cooperated with an order to back up to the front of the cell so that he could be handcuffed and also allowed restraints to be put on his ankles.  However, once at the nurses' station, the Plaintiff refused medical treatment for the laceration to his posterior scalp.

On March 30, 2005, at approximately 12:29 p.m., the Plaintiff was physically restrained by a physical force team, not consisting of any of the Defendants, after the Plaintiff refused to back up to his cell door and allow the officers to handcuff and restrain him so that they could conduct a routine check of the manual override mechanism on the electronically operated cell door.  The disciplinary report for this incident states that the Plaintiff tried to grab the officers' batons, fought against them, and tried to hit them.

After this incident, the Plaintiff received medical treatment from Nurse Practitioner Chanin Hiland.  Hiland noted that the Plaintiff had refused medical treatment for the laceration to his posterior scalp on March 29 and told him that he needed stitches for the laceration, which had reopened.  The Plaintiff consented; the wound was sutured and covered with steri strips.  For this incident, the Plaintiff was found guilty of a major disciplinary violation for physical actions against staff, and was given 180 days disciplinary segregation time.

The incident that is the subject of this action began around 11:17 p.m. on March 31, 2005, when Defendants Belt and Hines observed the Plaintiff repeatedly striking his closed left fist against his cell door, blood covering his left hand.  The Plaintiff refused to stop striking the door and refused to back up to the door so that he could be handcuffed and taken for medical treatment.  The Plaintiff continued to be uncooperative, despite Defendant Belt's attempt to reason with him over the course of the hour, and at approximately 11:50 p.m. Defendant Belt requested and received authorization to form a "move" team to enter the Plaintiff's cell and use physical force, if necessary, to restrain him by placing him in "hobbles," mechanical restraints constructed of handcuffs and leg shackles connected by a chain.

The "move" team was assembled by 12:00 a.m. and consisted of Defendants Belt, Hines,

4

Thompson, Redmond, Slayton, and Towery.  In addition, Nurse Bruce Bauer was called to the scene and stood by to offer medical assistance to the Plaintiff and the officers, if needed.

At this point, the officers began taping the "use of force video," and the following facts are taken from the videotape and the submitted affidavits.  The Defendants state that the time displayed on the video is two minutes fast; therefore, in recounting the following events, the Court has taken two minutes from the time displayed in the video.

The video begins with Defendant Belt introducing the situation and stating why a "move team" has been requested and authorized.  Defendant Belt states for the camera the members of the team and the weapons each carries, i.e., Defendant Thompson with the taser shield, Defendant Towery with a baton.  Defendant Belt states that the team will place Bateman in hobbles "to keep him from hurting himself."

Throughout Defendant Belt's introduction, the Plaintiff can be heard shouting and singing very loudly in the background.  Once the "move" team was outside the Plaintiff's cell door, the Plaintiff can be heard shouting "don't come in."  Lieutenant Bell ordered the Plaintiff more than once to back up to the door to be cuffed and restrained, but the Plaintiff refused.  The Plaintiff was sprayed with mace at 12:03 a.m., which was confirmed by the camera operator. While this is not discernible on the video, the Plaintiff apparently blocked the first blast of spray with a styrofoam plate.  He was sprayed again, but the spray had little effect, if any.

Shortly thereafter, the team opened the door and moved into the cell.  First to enter was Defendant Thompson, carrying the taser shield.  Defendant Thompson attempted to use the shield to physically hold the Plaintiff against the wall.  The Plaintiff resisted and Defendant Thompson activated the shield.  However, the taser did not incapacitate the Plaintiff and the rest

5

of the team moved into the cell.

The Plaintiff stands 6'4" in height and weighed at least 300 pounds at the time of the incident. While the video is not of the best quality, it is clear that the Plaintiff did not comply with the officers' orders, and a struggle ensued in an attempt to subdue the Plaintiff. The video goes out of focus for a few moments at this point, but the audio is clear. The officer's batons can be heard hitting metal inside the cell, and the sound is muffled when a blow lands on the Plaintiff. The officers repeatedly ordered the Plaintiff to stop resisting and put his hands behind his back, but the Plaintiff did not comply and the orders continued.

While this is not shown on the video due to the perspective, the Plaintiff apparently dove under the bed at this point. This is indicated on the video by the officers leaning over and struggling. There are no sounds of batons being used at this time. The Plaintiff began hitting his head against the metal bed frame. Lieutenant Bell repeatedly ordered the Defendant both to produce his arms to be handcuffed and to stop resisting.

The officers were eventually able to remove the Plaintiff's lower body from under the bed and shackle him. The Defendant also eventually said "I give." He was handcuffed at approximately 12:13 a.m.

At approximately 12:15 a.m., it is confirmed on the video that the Plaintiff has been handcuffed and shackled, and he was immediately taken to the shower to wash the pepper spray off his body. The Plaintiff was then taken to a clean cell, where he was placed in four-point restraints. While in the restraints, he received medical care from Nurse Bauer. Nurse Bauer checks the Plaintiff's restraints, determines that one is too tight and orders it to be loosened, and then examines the Plaintiff.

6

Nurse Bauer found the Plaintiff conscious and alert, with no symptoms of head injury. There were two superficial cuts on the top of his head, a cut above his right eye, and a cut to his upper lip.  Nurse Bauer determined these cuts did not require sutures.  The Plaintiff also had two lacerations to his left ring finger, which Nurse Bauer presumed were a result of the Plaintiff beating his fist against the cell door, but which did not appear to require stitches.  Nurse Bauer also noted the Plaintiff's prior, sutured, laceration to his posterior scalp.  The video shows Nurse Bauer cleaning and bandaging the wounds.

Nurse Bauer then tended to the officers, several of whom received minor injuries. Officer Towery was sent to Caldwell County Hospital, complaining of pain in his left wrist, where it was determined that the was bruised.  His wrist was placed in a splint, pain medication was prescribed, and he was excused from work for two days.  Lieutenant Belt suffered a pulled muscle in his right shoulder.  Officer Thompson suffered a pulled back muscle.

At 3:10 a.m., Dr. Steve Hiland, a prison physician at KSP, was contacted by telephone and advised of the situation.  Dr. Hiland granted a three-hour extension for keeping the Plaintiff in four-point restraints due to the Plaintiff's continued hostile and disruptive behavior.  Dr. Hiland examined the Plaintiff at 5:58 a.m. and ordered another three-hour extension.

Later that same day, the Plaintiff was transferred from the KSP to the KSR's CPTU for psychiatric evaluation pursuant to an order of Dr. Scott Hass, the Medical Director of the Department of Corrections.

The Plaintiff has produced medical records indicating that the was admitted to the University of Louisville Hospital on April 5, 2005, and discharged on April 8, 2005, where he was diagnosed with "left ring finger proximal interphalangeal fracture and infection" and

underwent "irrigation and debridement of his left ring proximal interphalangeal joint."

The Plaintiff was released from prison on January 13, 2006, due to the expiration of his sentence.  On March 29, 2006, the Plaintiff filed his Complaint in this action.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).  When opposing parties tell two different stories, one

8

of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

## DISCUSSION

The Plaintiff has filed this civil rights action pursuant to 42 U.S.C. § 1983 against all the Defendants individually and in their official capacities.  The Plaintiff alleges that the KSP officers involved in the April 1, 2005, incident, Defendants Troy Belt, Daniel Hines, Garyth Thompson, Cleo Redmond, Gary Slaton, and James Towery, used excessive force to restrain him during the forced cell entry, subjecting him to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.  The Plaintiff also alleges that Defendant Thomas Simpson, current Warden at the Kentucky State Penitentiary (KSP), may be held liable under § 1983 for the alleged constitutional violation on grounds of alleged lack of supervision or training and alleged policies or practices at KSP that subject inmates who "exhibit medical conditions or problems" to excessive force.

The Plaintiff's complaint also includes state law claims of intentional infliction of emotional distress, negligence, and assault and battery, along with a claim for punitive damages.

## A.  Official Capacity

The Plaintiff has asserted claims for damages against each of the Defendants in their official capacities.  The Eleventh Amendment prohibits suits against state governments and officials acting in their official capacity unless Congress has abrogated the sovereign immunity of the state. *Quern v. Jordan*, 440 U.S. 332, 341 (1979).  The United States Supreme Court, in *Will v. Michigan Dept. Of State Police*, a case arising from the Sixth Circuit, held that a "suit

9

against a state official in his or her official capacity is not a suit against the official, but rather a suit against the official's office." *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 67 (1989). As such, a suit against a government agent in their official capacity equates to a suit against the government agency in question, which in this case would be the Commonwealth of Kentucky. However, "[i]t is well-established that a plaintiff cannot sue a state agency or any of its employees in their official capacities for monetary damages. *See, e.g., Thiokol Corp. v. Dep't of Treasury, State of Mich., Revenue Div.*, 987 F.2d 376, 381 (6th Cir.1993); *Tucker v. Ohio Dept. of Rehabilitation and Corrections*, 157 F.3d 453, 456 (6th Cir. 1998). However, the Eleventh Amendment does not preclude suits against state officers for money damages to be paid out of the officer's own pockets. *Kentucky v. Graham*, 473 U.S. 159 (1985).

In the instant matter, the claims against Defendants in their official capacities for money damages amounts to a claim against the Commonwealth of Kentucky. As such, the federal claims brought against the Defendants in their official capacities seeking monetary damages are precluded by the Eleventh Amendment.

The immunity for the Defendants in their official capacity also applies to the state law claims brought by the Plaintiffs. In *Yanero v. Davis*, the Kentucky Supreme Court determined that suits brought against state officials and officers in their official capacity fail as a matter of law unless the state consents that the officers and/or official may be liable in their official capacity. *Yanero v. Davis*, 65 S.W.3d 510, 517-518 (Ky. 2001). In the instant matter, the Commonwealth of Kentucky has not waived its immunity as to the claims brought by the Plaintiff against the Defendants. *Id.* 519, 522. Accordingly, the state law claims against the Defendants in their official capacities fail as a matter of law.

**B.  Failure to Complete Service Upon John and Jane Doe Defendants**

The Plaintiff's claims against John Does and Jane Does, individually and in their official capacities as officers at the Kentucky State Penitentiary, must be dismissed.  The Plaintiff's Complaint was filed over two years ago, and the Plaintiff has neither identified nor completed service on the John Doe and Jane Doe defendants.  The Plaintiff admits that he has no argument against the dismissal of these claims.  Therefore, the Plaintiff's claims against those unknown defendants must be dismissed pursuant to Fed. R. Civ. P. 4(m).

**C.  Defendant Warden Thomas Simpson**

The Plaintiff claims that Defendant Simpson "established policies either formally or by custom for, and was responsible for the employment, training, supervision and conduct of the officers and employees of the Penitentiary."

However, the Plaintiff incorrectly asserts in his complaint that Defendant Simpson "was at all times mentioned herein acting individually and/or in his capacity as warden at the Penitentiary."  The Defendants assert that Defendant Simpson did not become Warden at KSP until September 1, 2005, after the events alleged in the Plaintiff's complaint occurred, and he did not even work at KSP at the time.  He had no personal involvement with the forced entry and restraint of the Plaintiff on April 1, 2005.

Further, "§ 1983 liability of supervisory personnel must be based on more than the right to control employees."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citing *Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1982)).  "Section 1983 liability will not be imposed solely upon the basis of respondeat superior."  *Id.* The Plaintiff must show that the "supervisor encouraged the specific incident of misconduct" or, at a minimum "at least implicitly authorized,

11

approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.*

The Plaintiff has not responded to the Defendants' assertion that Defendant Simpson was not Warden at KSP on April 1, 2005, and has made no showing that Defendant Simpson was a supervisory official possibly subject to such § 1983 liability.  Therefore, the Plaintiff's claims against Defendant Simpson must be dismissed.

**D.  Qualified Immunity**

The Defendants argue that they are entitled to the defense of qualified immunity.  The United States Supreme Court, in *Harlow v. Fitzgerald*, stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The threshold question in resolving questions of qualified immunity is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If, and only if, the court finds a violation of a constitutional right, it then asks whether the right was clearly established "in light of the specific context of the case." *Id.*  "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

**1. The Defendant's excessive force claim**

The Plaintiff alleges that Defendants Troy Belt, Daniel Hines, Garyth Thompson, Cleo Redmond, Gary Slaton, and James Tovery violated his Eighth and Fourteenth Amendment rights

by improperly using excessive force during the April 1, 2005 incident.  As Plaintiff was a convicted prisoner at the time of the alleged misconduct, his § 1983 claim is properly premised on the Eighth Amendment's cruel and unusual punishment's clause only.  *Whitley v. Albers*, 475 U.S. 312, 319-10 (1986); *Doe v. Sullivan County*, 956 F.2d 545, 556 (6th Cir. 1992).

"After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley*, 475 U.S. at 319 (quoting *Ingraham v. Wright*, 430 U.S. 651 670 (1997) (internal quotation omitted)).  To constitute cruel and unusual punishment, "conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."  *Id.*

An Eighth Amendment claim is comprised of both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 833-36 (1994).  The objective component requires the plaintiff to show that the deprivation or act was "sufficiently serious" to implicate the Eighth Amendment.  *Id.* at 834.  To be "sufficiently serious," the deprivation or act must deny the prisoner of "the minimal civilized measure of life's necessities," *id.*, as defined by contemporary standards of decency.  *See Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004).  "The Eighth Amendment's prohibition of "cruel and unusual  punishment necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (quoting *Whitley*, 475 U.S. at 327 (internal quotation omitted)).

The subjective component requires the plaintiff to prove that the defendants possessed a culpable state of mind.  When prison officials are accused of using excessive physical force in violation of the cruel and unusual punishments clause, the core judicial inquiry is "'whether

13

force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.'"  *Whitley*, 475 U.S. at 320-21 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d. Cir. 1973)); *Hudson*, 503 U.S. at 7; *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992) ("in the prison context, good faith use of physical force may be necessary to maintain prison security and discipline").

When evaluating whether a prison official's conduct falls short of this standard, the Court must consider the following factors: (1) extent of the injury suffered by the inmate, (2) the need for the application of force, (3) the relationship between such need and the force used, (4) the threat reasonably perceived by the prison official, and (5) any efforts undertaken to temper the severity of the response.  *Hudson*, 503 U.S. at 7 (citing *Whitley*, 475 U.S. at 321).

In considering these factors, the courts should accord deference to prison administrators "'in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,'" and should not "freely substitute their judgment for that of officials who have made a considered choice." *Whitley,* 475 U.S. at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).  However, in determining "whether or not a constitutional violation ha[s] occurred, 'all the facts and circumstances surrounding the application of force must be scrutinized and weighed.'" *Williams*, 981 F.2d at 906 (quoting *Lewis v. Downs*, 774 F.2d 714 (6th Cir. 1985)).

**a.  Applying these principles to the facts of this case**

The Plaintiff has not proved either that he suffered a sufficiently serious deprivation to implicate the Eighth Amendment's ban on cruel and unusual punishments or that the Defendants applied physical force against him maliciously and sadistically for the very purpose of harming

14

him.  *Farmer*, 511 U.S. at 834; *Whitley*, 475 U.S. at 320-21.

The Court finds the "use of force" video particularly instructive in this case.  The video, combined with the submitted affidavits, medical records, and records detailing the Plaintiff's history in the corrections system, disprove the Plaintiff's claims.  The Court finds that the Defendants used force against the Plaintiff reasonably and in pursuit of a valid institutional goal.  The force was applied in a good-faith effort to restore discipline and provide medical attention to the Plaintiff, and it was not applied "maliciously and sadistically for the very purpose of causing harm."  *Hudson*, 503 U.S. at 7.

The Plaintiff asserts that he posed no threat to the guards or other inmates and that the "attack" on him was unprovoked and vicious.  However, the video tells a different story.  In the video, Defendant Bell clearly states that the purpose of the move team was to prevent the Plaintiff from hurting *himself.*  The Plaintiff had been repeatedly striking his cell door with his left fist and had clearly injured himself, as he had blood covering his hand.  Repeated attempts to get the Plaintiff to voluntarily present himself for handcuffing so that he could receive medical attention failed.  The situation was very prolonged and the Plaintiff caused a major disturbance; he can be heard on the video shouting somewhat threatening and disturbing phrases  incessantly.

"'Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.  Someone must exercise authority and control.'"  *Caldwell v. Moore*, 968 F.2d 595, 601 (6th Cir. 1992) (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984)).  If an inmate "cannot be persuaded to obey the order," a correctional officers must use some means "to compel compliance, such as a chemical agent or physical force."  *Id.* at 602.

Here, the Defendants began with giving the Plaintiff direct orders to back up to the door

15

so that he could be handcuffed.  When this failed, the move team was assembled.  The move

team's first step was to try and obtain the Plaintiff's compliance by spraying him with mace.

The Plaintiff blocked the first spray, requiring Defendant Belt  to spray him a second time.

However, the second spray had no effect on his behavior or compliance.

The ineffectiveness of the mace necessitated the move team's next step: the opening of

his cell door and Defendant Thompson's entrance with the taser shield.  Defendant Thompson

first attempted to physically pin the Defendant to the wall with the shield.  When the Plaintiff, at

6' 4" and over 300 pounds, actively resisted, Defendant Thompson activated the shield.

However, this had no discernable effect on the Plaintiff as he continued actively resisting.

Finally, the rest of the move team entered the cell and attempted to physically subdue the

Plaintiff.  The Defendants used their batons, directing their blows to the Plaintiff's torso,

although the Defendants admit that in the fracas, some blows may have inadvertently landed on

the Plaintiff's head.  The Defendants combined this physical force with repeated direct orders

from Defendant Belt to stop resisting and to put his hands behind his back, all of which can be

clearly heard on the video.

However, instead of ceasing his struggle and obeying orders, the Plaintiff chose to hide

under his bed, necessitating the officers' further use of physical force to extricate him.  Once the

Plaintiff was restrained and under control, the use of physical force completely ceased.  The

video shows the Defendants immediately taking the Plaintiff to the showers in order to wash the

mace off his body.  The video then shows the Defendants taking the Plaintiff from the showers to

a clean cell.  In the clean cell, the Plaintiff continued to struggle against being placed in four-

point restraints, although the Defendants were able to restrain him.  Once he was restrained, the

16

Plaintiff received immediate medical attention from Nurse Bauer.

Considering the Plaintiff's extreme resistance and noncompliance with the Defendants' orders, the Defendants' use of force in an attempt to bring him under control was reasonable.  It was the Plaintiff's own conduct which necessitated the use of physical force.  The Plaintiff has failed to prove both the objective and subjective elements of cruel and unusual punishment.  He has not shown that any of the Defendants acted with a sufficiently culpable state of mind, nor has he shown that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.  *Hudson*, 503 U.S. at 8.

Objectively viewed, the Defendants' collective use of force was not sufficient to give rise to a constitutional violation because the Plaintiff has not shown a "sufficiently serious," that deprived him of "the minimal civilized measure of life's necessities," defined by contemporary standards of decency.  The actual amount of force used against the Plaintiff was, in all likelihood, not de minimis because over the course of ten minutes the Defendants were forced to use mace, a taser shield, and batons to bring the Defendant under control, but that force did not give rise to a constitutional violation.  Further, the Plaintiff contributed to his own injuries both by literally hurting himself and by actively resisting the guards in their reasonable attempt to restrain him.

The Plaintiff already had a sutured laceration on his scalp prior to the April 1, 2005, incident.  Therefore, that injury cannot be considered.  Nurse Bauer, who examined the Plaintiff *immediately* after he was restrained, determined that the Plaintiff suffered two superficial cuts to the top of his head, a cut above his right eye, and a cut to his upper lip.  By all accounts, when the Plaintiff dove under the bed to evade the officers, he began banging his head against the

17

frame, and in their affidavits, the Defendants state they did not see any of these cuts prior to that time.

The Plaintiff also had two lacerations on his left ring finger.  The entire incident began when Defendants Belt and Hines found the Plaintiff repeatedly striking his closed left fist against his cell door, blood covering his left hand.  The Plaintiff refused to comply with the Defendants' orders so that he could receive medical attention for his hand.  The Plaintiff has produced medical records indicating that the was admitted to the University of Louisville Hospital on April 5, 2005, and discharged on April 8, 2005, where he was diagnosed with "left ring finger proximal interphalangeal fracture and infection" and underwent "irrigation and debridement of his left ring proximal interphalangeal joint."  Thus, it appears that the Plaintiff's left ring finger was both fractured and infected as of April 5, 2005.

However, the Court cannot attribute the infection to the acts of the Defendants. Immediately after the incident in question, Nurse Bauer treated each of cleaned and treated each of the Plaintiff's injuries, including the lacerations to his left ring finger.  Further, the Plaintiff was later examined by Dr. Steve Hiland.  Later that day, the Plaintiff was transferred to the KSR and had no further contact with the Defendants.  There is a four day gap in the record during which time the Plaintiff was not under the Defendants' supervision, and the Court has no knowledge of why the finger became infected.

As for the fracture in the same finger, the Defendant was found repeatedly striking his closed left fist against his cell door, and had apparently done it with such force as to break the skin and draw blood.  Thus, the Plaintiff's hand was already injured prior to the incident.  Even if the Plaintiff's finger was further injured during the incident (although the Court offers no

18

opinion on this matter), it was a result of his active resistance to the Defendants' reasonable attempt to restrain him.  The Defendants did not deprive him of "the minimal civilized measure of life's necessities," defined by contemporary standards of decency. *Hadix*, 367 at 525,

Objectively, the use of force against the Plaintiff was not "repugnant to the conscience of mankind." *Hudson*, 503 U.S. 1, 9-10.

Even though the Plaintiff's injuries are insufficient to give rise to a constitutional violation, he has also failed to present any evidence to establish the subjective component of an Eighth Amendment claim, that is, that the Defendants acted with a sufficiently culpable state of mind.  There is no evidence that the Defendants acted "maliciously and sadistically to cause harm." *Id.* at  6-7.  The Defendants' use of force against the Plaintiff was an appropriate reaction to an escalating situation in which the Plaintiff failed to comply with numerous orders to back up to the door to be handcuffed so that he could receive medical attention for his injured left hand.

Defendant Belt followed procedures and requested permission to form a "move" team to restrain the Plaintiff in order to keep him from hurting himself.  The "move" team documented the entire encounter on video.  The video shows the team moving through a series of steps in an attempt to obtain compliance: direct orders, mace, pinning with the taser shield, activation of the taser shield, and finally, physical force through batons and other physical contact.  When the first four steps in the series were met with extreme resistance from the Plaintiff, the Defendants were left with no choice but to enter his cell and physically subdue him.  Even then, the Plaintiff violently resisted the Defendants.

The Plaintiff claims that he has no history of violence and was doing nothing more on the night in question than "talking and signing loudly" in his cell.  However, the video plainly

19

contradicts the Plaintiff's claims of only "talking and singing."  The video shows the Plaintiff causing a major disturbance, repeatedly shouting threatening phrases and ignoring all orders from the Defendants.

Further, the Plaintiff's claims that he has no history of violence are negated by the record. The Plaintiff was transferred to the KSP Maximum Security Segregation Unit after being given 345 days of disciplinary segregation time as a result of being found guilty of four major disciplinary violations connected to his assault of corrections staff at Roederer Correctional Complex on February 28, 2005.  The members of the move team understood the basis for the Plaintiff's transfer to KSP.

In addition, only a day earlier, on March 30, 2005, at approximately 12:29 p.m., the Plaintiff was physically restrained by a physical force team of other KSP corrections officers after he refused to back up to his cell door and allow the officers to handcuff and restrain him so that they could conduct a routine check of the manual override mechanism on the electronically operated cell door.  The disciplinary report for this incident states that the Plaintiff tried to grab the officers' batons, fought against them, and tried to hit them.

There is simply no evidence that the Defendants violated the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.  For an incarcerated person, "only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley*, 475 U.S. at 319.  Nothing here indicates that the Plaintiff was subjected to the 'unnecessary and wanton infliction of pain."  In contrast, the video of the incident, combined with the affidavits and other documentation, indicate that the Defendants subjected the extremely noncompliant Defendant to the appropriate amount of force

20

necessary to restrain him in order to keep him from further hurting himself and end the disturbance he was causing.

## 2. The defense of qualified immunity

The Defendants are entitled to the defense of qualified immunity.  Taken in the light most favorable to the Plaintiff, the facts do not show that he Defendants' conduct violated the Plaintiff's Eighth Amendment rights.  *Saucier,* 533 U.S. at 201.  As there was no violation of a constitutional right, the Court will not move on to the second step in the qualified immunity analysis, asking whether the right was clearly established "in light of the specific context of the case."  *Id.*  The Plaintiff has not met his burden of demonstrating that the Defendants are not entitled to qualified immunity."  *Silberstein*, 440 F.3d at 311.

## E.  State Law Claims

The Plaintiff's Complaint includes state law claims of intentional infliction of severe emotional distress (Count II), negligence (Count III), assault and battery (Count IV), and punitive damages (Count V).  As discussed above, the Defendants are entitled to summary judgment on the Plaintiff's federal claim.  When a plaintiff has no federal cause of action, a district court may exercise its discretion to dismiss pendent state law claims.  *Gregory v. Hunt, et al.*, 24 F.3d 781 (6th Cir. 1994).  *See also United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

Thus, in light of the Court's dismissal of all of the federal claims in this action, the Court declines to exercise jurisdiction over the Plaintiff's pendent state law claims.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is

**GRANTED**.

An appropriate order shall issue.